McBRIDE, Judge.
Plaintiff brought this suit against defendants for $415.60 representing hospital' services rendered one Charles M. Koloas,. age 66, between February 7 and February 15, 1962; defendants are sought to he heldl jointly, severally and in solido for said charges on the allegation that they represented they would be responsible for any and all expenses incurred in the caring for and hospitalization of said patient. The defense is a general denial.
After a trial on the merits, there was-judgment in favor of plaintiff against defendant Kambur as prayed for; the suit as against the other defendant, John Fatsis, was dismissed. Kambur has appealed, but the plaintiff failed to appeah from that part of the judgment which, dismissed its suit as against Fatsis.
*215 Paul Montelepre, administrator of the hospital, on February 7, 1962, at approximately 10:00 p. m. was called by telephone at his home by Mrs. Cook, the admit clerk, who stated that two men were seeking to have a man named Koloas admitted to the hospital, and she wanted Mon-telepre’s approval before making the admission. The call was made through the hospital’s switchboard; after speaking with Mrs. Cook, Montelepre then spoke with a person, one of the men who was seeking the admission who identified himself as Kambur. Montelepre states Kam-bur told him Koloas was his friend and that Dr. Philip LaNasa was going to take care of him and that he (Kambur) and Captain John Fatsis would be responsible for Koloas’s hospital bill. Montelepre then informed the admit clerk it was all right to admit the patient. Montelepre states that during the conversation Kambur told him that Koloas worked for Fatsis.
Montelepre also stated that earlier that same evening a Miss Margie Yorcenti, a former employee of the hospital, had called him about Koloas’s sickness stating that Dr. LaNasa had been to Koloas’s home to see him and had advised that he be hospitalized; Miss Yorcenti stated that Kambur and Captain Fatsis made all the arrangements with Dr. LaNasa and they would also pay the hospital bill. Miss Yorcenti did not appear as a witness.
On February 15, 1962, when the hospital bill was mounting and unpaid, Koloas was transferred to Charity Hospital. Montelepre states that Kambur requested the transfer, and Montelepre thinks the authorization came via telephone but is not sure. Later on that same date, Dr. LaNasa told Montelepre he had seen the patient and was sending him to Charity Hospital.
Mrs. Ruth B. Cook, the admit clerk, testified that on the evening in question Kambur and Fatsis came into the admit office together; that Koloas was not with them, as he was too ill to be brought to the office and had already been taken upstairs to a room. She stated Kambur did most of the talking and gave all information necessary for the hospital records, such as patient’s name, age, occupation, etc.; that she filled out the admit card in her own handwriting; that she asked if there were any relatives, and Kambur and Fatsis stated they did not know of any; that Kambur and Fatsis gave their names, their home addresses and their home and office telephone numbers so they could be called at any time in the event it was necessary for the hospital to communicate with them with reference to the patient. Mrs. Cook stated she made the telephone call to Montelepre over the hospital switchboard and that Kambur spoke to Montelepre, but she does not know what was said as she did not hear much of the conversation; that Mon-telepre again spoke with her after he had spoken with Kambur and instructed her to admit Koloas. She states she asked both Kambur and Fatsis if they would be responsible for the hospital bill and both said “yes.” She inserted their names on the admit card (contained in the record) on the line “Responsibility for payment of account.” In the courtroom below, Mrs. Cook identified both Kambur and Fatsis as the men who were in the admit office at the time the above arrangements were being made for Koloas. She stated there is a certain form which the patient had to sign authorizing treatment, operations, etc. She stated she had to go upstairs to Koloas’s room to have him sign the authorization form.
The above constitutes the pertinent testimony relied on by plaintiff.
On the other hand, defendants have a different version of what happened.
Kambur and a man named Tuttle testified that on February 7, 1962, about 9:00 p. m., while Tuttle was having dinner at Kambur’s home, a telephone call came through to Kambur by which he was informed that Koloas, his friend, was ill. *216 They stated they both proceeded to Koloas’s quarters in a rooming house where he lived; they saw Koloas, and he had the appearance of being very ill; Kambur stated he asked Koloas if he would like to go to Charity Hospital but Koloas answered that he did not want to be placed in Charity Hospital, but desired to go to Montelepre Hospital. Kambur says Koloas stated, “Dr. Philip LaNasa is my physician and I have insurance.” Kambur claims he went downstairs to the landlady’s room and telephoned Paul Montelepre at his home inquiring of him if he had a bed available for Koloas, and Montelepre instructed him to take Koloas to the hospital. Kambur’s testimony as to the making of such call to Montelepre is supported by Tuttle. Montelepre denies having received any such call from Kambur. At any rate, Kambur and another conveyed Koloas to Montelepre Hospital.
Kambur denies having requested the transfer of the patient to Charity Hospital.
Kambur says that it was he and Tuttle who went to the Montelepre Hospital to have Koloas admitted. Both Kambur and Tuttle deny Fatsis was present. Kambur states he called Dr. LaNasa from the hospital requesting him to treat Koloas. But he does not remember whether he talked to Montelepre from the hospital. In that regard, his testimony runs thus:
“We then, Mr. Tuttle, myself and Koloas went to the hospital and I don’t remember any conversation with Mr. Montelepre at the hospital, I just don’t remember whether I talked to him at the hospital, * * * ”
******
“I’m sorry, I don’t remember if I talked to Mr. Montelepre, * * * ”
Kambur and Tuttle both insist that while they were in the admit room, Koloas, who was very ill, was with them and that Tuttle was holding him up. Kambur and Tuttle deny there was any conversation with Mrs. Cook regarding the responsibility of Kambur and Fatsis for the bill. Kambur denies any responsibility. He testified that Koloas himself informed Mrs. Cook that he had insurance.
Such is the confused and conflicting testimony in the record before us. Evidently the trial judge was impressed with the testimony of Montelepre and Mrs. Cook, for he could not have rendered judgment against Kambur otherwise. We are also satisfied that plaintiff’s version of the affair is the correct one. Kambur’s lack of memory as to the telephone conversation at the hospital is significant. We note he never denied speaking with Montelepre when the admit clerk called him. But it seems to us the trial judge erred in eliminating Fatsis from the case, our opinion being that he also agreed to> be responsible. But as Fatsis is not before us, we cannot revise the judgment so far as it dismisses the suit against him.
In the alternative, Kambur urges; that his agreement to pay, if any, did not amount to a primary obligation and was. but a promise to pay the debt of a third person. He argues he cannot be held' liable as his promise was not reduced to. writing, citing LSA-C.C. art. 227S.
Plaintiff is not proceeding to collect the bill on the premise that the defendants agreed to pay the debt of a third person.. Plaintiff’s position is that the obligation, was primary on the part of the defendants and that the credit was extended to them and not to Koloas. Defendant Kambur’s. alternative contention is not valid. We are not dealing with any promise to pay a third person’s debt. The credit was extended to defendants, and under the law there is a primary obligation to pay the amount due. Under these circumstances LSA-C.C. art. 2278 with reference to proving a promise to pay the debt of a third person is inapplicable in this instance.
In Taylor v. Loeb, 13 La.App. 327, 127 So. 637, two brothers arranged with a. *217 nurse for the furnishing of board and lodging and personal attention to their sister; when sued for the bill, they made the defense that they at no time promised to be responsible. The late Court of Appeal for the Parish of Orleans held that there was no difficulty in reaching a conclusion that whether or not, in definite words, either one of the brothers agreed to pay, the whole tenor of the conversation justified plaintiff in believing that such was their intention. The Court further said:
“It cannot be said that, in thus undertaking to be responsible for their sister’s expenses, they were agreeing to pay the debt of a third person, for several reasons; primarily, because the debt had not yet accrued and because their conversation, made in advance of the accrual of the debt, constituted the debt their own obligation.”
In Great Southern Lumber Co. v. Bates, La.App., 153 So. 332, it was held that a truck owner who authorized hospital, surgical and nursing attention for a boy injured by his truck was liable for such expenses. The Court said:
“Mrs. E. R. Summerall, who at the time the boy was entered was Miss Moore, was superintendent of the hospital. She testifies that it was her duty, among others, when patients were received, to make financial arrangements with the person who was to be responsible for the bill, and that, with regard to the Pigott case, Mr. Bates came in and said that ‘he would authorize the treatment and to go ahead with anything that was necessary.’ ”
*)* ^* ^* ‡ «}»
“It is significant to note, in connection with Mrs. Summerall’s testimony, that the account was at once opened in the name of W. L. Bates. It seems hardly probable that this would have been done without some good reason, and what better reason could there be than that Mrs. Summerall felt satisfied with the authority she had obtained from the defendant.”
In Magee v. Crowe, La.App., 111 So.2d 552, it was held that where the evidence established an obligation to pay for furniture sold to a third person on open account was a direct obligation of defendant, parol evidence was admissible to prove such direct or primary obligation, LSA-C.C. art. 2278 being inapplicable^
We believe that both defendants were liable for the bill which forms the basis of this suit. However, their obligation was joint rather than in solido. LSA-C.C. art. 2091 provides that there is an obligation in solido on the part of the debtors when they are all obliged to the same thing, so that each may be compelled for the whole, and when the payment which is made by one of them, exonerates the others toward the creditor.
Under LSA-C.C. art. 2093 an obligation in solido is not presumed; it must be expressly stipulated, except where an obligation in solido takes place of right by virtue of some provisions of the law.
The Court in Taylor v. Loeb, supra, also held that in the absence of a stipulation for solidary liability, the promise of the brothers to pay for the nursing care, etc., furnished their sister was a joint obligation, citing LSA-C.C. art. 2093. Thus, Kambur is only liable jointly or for one-half of plaintiff’s claim, and the judge below erroneously cast him for the whole.
For the reasons assigned, the judgment appealed from is amended so as to reduce the amount thereof to $207.80, and as thus amended and in all other respects the judgment is affirmed. Plaintiff is to pay the costs of appeal.
Amended and affirmed.